NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| | : | |
| MANAL HANANI, | : | |
| | : | Civ. No. 03-3111 (GEB) |
| Plaintiff, | : | |
| | : | **MEMORANDUM OPINION** |
| v. | : | |
| | : | |
| STATE OF NEW JERSEY, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

---

**BROWN, District Judge**

This matter comes before the Court upon the defendants' motion for summary judgment

pursuant to Fed. R. Civ. P. 56.  The Court has jurisdiction over this matter pursuant to 28 U.S.C.

§ 1331.  The Court, having considered the parties' submissions and having decided this matter

without oral argument pursuant to Fed. R. Civ. P. 78, and for the reasons discussed below, will

grant defendants' motion for summary judgment.

I.       **BACKGROUND**

Plaintiff Manal Hanani ("Plaintiff") is a naturalized citizen of the United States.  She is of

Egyptian national origin.  See Plaintiff's L. Civ. R. 56.1 Stmt. at 3.  She holds a Bachelors of

Science in Engineering from the New Jersey Institute of Technology and obtained a Professional

Engineering License in 2000.  Id.

In or around July 1988, Plaintiff commenced employment with defendant the State of

New Jersey, Department of Environmental Protection ("DEP"), Bureau of Safe Drinking Water

as an Environmental Engineer Trainee.  See Complaint at ¶ 15.  On or about January 14, 1989,

she was promoted to Assistant Environmental Engineer.  Id. at ¶ 16.  On or about October 6, 1990, she was promoted to Senior Environmental Engineer.  Id. at ¶ 17.  On or about August 10, 1991, she was provisionally promoted to Principal Environment Engineer.  Id. at ¶ 18.  This appointment became permanent on or about January 15, 1991.  Id.  None of these promotions were performance based; that is, they were not initiated by Plaintiff's managers.  The promotions were either consistent with standard promotion practices within the DEP (e.g. employees are generally promoted to the position of Senior Environmental Engineer within one (1) year of being hired) or as a result of an across-the-board series of promotions offered to a certain class of employees.  See Plaintiff's L. Civ. R. 56.1 Stmt. at 3-4.  Plaintiff has not been promoted since her permanent appointment to Principal Environment Engineer.  Id. at 19.

By way of background, the DEP is divided into various operational Administrations.  Pl. L. Civ. R. 56.1 Stmt. at 4.  One of these Administrations is the Water Supply Administration, which is divided into two separate Bureaus: (1) the Bureau of Safe Drinking Water, and (2) the Bureau of Water Allocation.  Id.  As discussed above, Plaintiff was employed by the Bureau of Safe Drinking Water (hereinafter, "the Bureau") throughout her tenure at the DEP.  Id. Defendant Barker Hamill ("Hamill") was the Chief of the Bureau at all relevant times.  Hamill's direct reports were the three (3) Section Chiefs – defendant Philip Royer ("Royer"), Vince Monaco and Sandra Kreitzman ("Kreitzman").  Id. at 4.  Employees within the Bureau are classified as either "Environmental Engineers" or "Environmental Specialists."  Plaintiff contends that there is no substantive demarcation between these titles and that they are regarded as interchangeable within the Bureau.  Id. at 4-5.  Within these titles, there are several promotion levels.  For example, with respect to those holding "engineer" titles, the progression is as

2

follows: Trainee Environmental Engineer, Senior Environmental Engineer, Principal Environmental Engineer, and Supervisory Environmental Engineer.  The promotion structure is identical for those holding "specialist" titles.  Id. at 5.

In or around October 1999, Paul Galek ("Galek"), a supervisory colleague, died.  Def. L. Civ. R. 56.1 Smt. at ¶ 7.  In or around March 31, 2000, Galek's former Supervising Environmental Specialist position was posted as a provisional appointment.  Complaint at ¶ 34. The position was open to Principal Environmental Engineers, Principal Environmental Specialists and Geologists.  Def. L. Civ. R. 56.1 Stmt. at ¶ 8.  Thirteen DEP employees applied for the provisional title.  Id. at ¶ 9.  All thirteen applicants were interviewed by a panel of four DEP officials – defendants Hamill and Royer, Kreitzman and Nancy Goreman.  Carla Hunt ("Hunt"), a human resources employee, oversaw the process but did not evaluate the candidates. Id. at ¶¶ 10-11.  Of the thirteen candidates, four (4) were of foreign nationality or ancestry – Plaintiff, Jay Patel, Adekunle Oguntala ("Oguntala") and Myonsgun Kong.[1]  Pl. L. Civ. R. 56.1 Stmt. at 10.  At the time of the posting and interview process, Plaintiff and the other three applicants of foreign ancestry held "engineer" titles.  Id. at 11.

The applicants' performance ratings, or PARS (hereinafter "PARS"), which evidenced the candidates prior performance and experience in the Bureau, were not considered.  Id. at 11-12.  The applicants for the provisional position were instead evaluated on the basis of their resumes and their responses to a series of seven (7) interview questions.  Id. at 11.  The candidates were then ranked in numerical order.  In or around June 2000, the Bureau Administrator, Shing Fu Hsueh ("Hsueh"), announced that Linda Friedman ("Friedman"), a

_____

[1]As set forth below, Plaintiff asserts discrimination based upon national origin (Egyptian).

3

white female, had been awarded the provisional appointment.  Complaint at ¶ 36.  None of the

five candidates of foreign origin were ranked in the top five.  See Pl. L. Civ. R. 56.1 Stmt. at 13.

Plaintiff was ranked thirteenth (13th) out of the thirteen (13) applicants and Mr. Patel was rated

twelfth (12th).  Mr. Oguntala was rated sixth (6th), the highest of the four foreign origin

candidates.[2]  See Def. L. Civ. R. 56.1 Stmt. at ¶ 15.  Plaintiff alleges that the subjectiveness of

this interview process and the resulting rankings evidence the disparate treatment of foreign

origin candidates at the DEP.

Subsequently, in or around July 2000, Plaintiff met with Hsueh to discuss Friedman's

appointment to the provisional title and expressed that she believed she was being discriminated

against.  Id. at ¶ 38.  Shortly after this meeting, Plaintiff filed a grievance with the Union, CWA

1034, through Representative John Seiler ("Seiler").  Complaint at ¶ 39.  Plaintiff explained the

circumstances of Friedman's provisional appointment and her belief that she was denied the

promotion based on her national origin.  Plaintiff also complained that defendant Royer, her

direct supervisor, had failed to give her any PARs for the period 1995-2000, despite her repeated

requests that he do so.  See Pl. L. Civ. R. 56.1 Stmt. at 8-9.  Plaintiff claims that Royer's failure

to complete PARs for her was discriminatory because he allegedly "did provide PAR reviews for

employees on his staff that were Caucasian Americans."[3]  Id. at 9.  Plaintiff's grievance

correspondence was transferred to DEP management.  Complaint at ¶ 39.  However, Plaintiff was

---

[2]Oguntala also asserted that he should have been selected rather than Friedman and also filed an action in this court claiming discrimination and retaliation based upon race, age and national origin.  That action was dismissed on summary judgment by Judge Thompson on March 11, 2003.  See Oguntala v. State of New Jersey, et al., Civil Action No. 02-586 (AET).

[3]As noted above, Plaintiff asserts national origin discrimination rather than discrimination based on race or citizenship.

informed by Seiler that the provisional appointment was not a grievable matter because she would again have an opportunity to obtain the position when it was posted for permanent status.[4] See Pl. L. Civ. R. 56.1 Stmt. at 17. Subsequently, Royer completed a PAR for Plaintiff dated October 31, 2000 and then transferred the task of completing her PARs to an employee named Patricia Craver ("Craver"). See Pl. L. Civ. R. 56.1 Stmt. at 9.

In or around October 2000, the provisional title held by Friedman was posted for permanent status, i.e. Supervising Environmental Specialist. See Complaint at ¶ 42. The applicant pool for the permanent title was substantially narrowed; only employees holding the title of Principal Environmental Specialist were permitted to apply. Id. As a result of the exclusion of Principal Environmental Engineers from the applicant pool, all of the eligible minorities who applied for the provisional position, including Plaintiff, were excluded from applying for the permanent position. Id.

Plaintiff still attempted to apply for the position, but was rebuffed by Hunt, who allegedly misinformed Plaintiff that the decision to exclude "engineers" from the applicant pool was not made by the Bureau management, including defendants Hamill and Royer, but instead by the New Jersey Department of Personnel (NJ DOP), an independent department of the State of New Jersey. See Pl. L. Civ. R. 56.1 Stmt. at 22. Plaintiff memorialized this conversation in an October 18, 2000 Memo to File, stating in relevant part:

_____

[4]The Court notes that, in or around July 2000, Plaintiff was allegedly given the new task of evaluating water supply permits. Plaintiff alleges that these permits were typically performed by employees of the Bureau of Water Supply. Further, Plaintiff alleges that she was assigned to work on a water supply program that was nearing completion. As a result, Plaintiff contends that defendant Royer insinuated that she might lose her job at the conclusion of this project. Plaintiff alleges that these are further instances of discriminatory treatment and harassment.

> Carla [Hunt] refused to accept my resume citing the fact that the
> position was open to Specialists only.  When I asked her who made
> that decision.  She said that the decision was made by the NJ DOP
> and to check with them as to why this decision was made.

Id. at 22-23.

After the competitive examination for the permanent position, Friedman was selected to fill the vacancy even though she allegedly ranked last among the six applicants who had taken the exam.  Id. at ¶ 45-46.  However, because of DEP rules, Friedman could not be promoted unless the three highest ranking applicants were first promoted.  Thus, in October 2001, the Bureau management team, including Hamill and Royer, allegedly manipulated the DEP rules and summarily promoted the three highest ranking applicants – Patricia Bono ("Bono"), William Dietze ("Dietze") and Matthew Maffei ("Maffei") – from Principal to Supervisory positions and then promoted Friedman.[5]  See Pl. L. Civ. R. 56.1 Stmt. at 19; Complaint at ¶ 26.  These three individuals are all white Americans.  These promotions of "three white Americans" allegedly violated the DEP rules requiring that vacancies be posted and subject to a competitive examination process.[6]  See Pl. L. Civ. R. 56.1 Stmt. at 20.

In or around January 4, 2002, Plaintiff had a meeting with Royer to again request a promotion.  See Complaint at ¶ 49.  Plaintiff complained about the other promotions made within

---

[5]The Court notes that Plaintiff complains that, in May 2000, another supervisory position was summarily awarded to "a white American," Scott Tyrell, without an interview or decision-making process.  See Pl. L. Civ. R. 56.1 Stmt. at 17.  However, Mr. Tyrell's promotion is not mentioned in either Plaintiff's EEOC charge or Complaint.  Even accepting Plaintiff's claim that Mr. Tyrell's promotion contravened the DEP's internal rules, Plaintiff's claims cannot survive summary judgment for the reasons discussed herein.

[6]As noted above, Plaintiff asserts national origin discrimination rather than discrimination based upon race or citizenship.

the Bureau and specifically mentioned that she believed that the process had been manipulated to ensure that Friedman obtained the supervisory promotion.  Id.  At this point, the meeting was moved to Hamill's office.  Hamill allegedly questioned Plaintiff why she had not applied for the permanent position.  Id. at 50.  When Plaintiff explained that she had been precluded from applying, Royer and Hamill stated that they were not aware of this decision and that it must have been made by NJ DOP.  Id.  This discussion prompted Plaintiff to further investigate who had made the decision to exclude engineers from applying for the permanent position awarded to Friedman.  See Pl. L. Civ. R. 56.1 Stmt. at 24.

On February 1, 2002, Plaintiff forwarded an email to Susan Mannix ("Mannix"), the NJ DOP employee who had signed the October 2000 posting, asking: "Was the Decision made by the appointment authority, was it made by the DEP Personnel or by the NJ State Dept. Of Personnel."  Id.  In her response, Mannix indicated that the decision had been made by the appointing authority, i.e. the DEP.  Id.  Upon further inquiry, Craig Stephens ("Stephens"), the DEP Director of Personnel, explained that the decision to exclude engineers was not made by the Department of Personnel, but instead by the "program," i.e. internally within the Bureau.  Id.  Therefore, Plaintiff alleges that defendants Royer and Baker lied to her when they "feigned ignorance" that engineers had been excluded from applying for the permanent position.  See Pl. Opp. Br. at 10.  Plaintiff alleges that this is a further instance of discrimination.

On February 14, 2002, Plaintiff filed a Charge of Discrimination with the New Jersey Division of Civil Rights (NJDCR) and the Equal Employment Opportunity Commission (EEOC), the same day that she received the letter from Stephens confirming that the Bureau management were involved in the decision to exclude engineers.  See Pl. L. Civ. R. 56.1 Stmt. at

7

28.  In her EEOC charge, Plaintiff alleged she was denied the promotion to the supervisory position based on her Egyptian national origin.  Plaintiff further alleged that Hunt informed her that her name had been removed from the list of those being considered for the promotion on February 5, 2001.  See Plaintiff's EEOC Charge (attached as Exhibit B to Defendants Motion for Summary Judgment).  On or about March 7, 2002, Plaintiff received a letter from the NJDCR indicating that it would process her complaint and advise the EEOC of its findings.  See Complaint at ¶ 10.  On or about April 1, 2003, the United States Department of Justice, Civil Right Division, issued Plaintiff a Notice of Right to Sue, which she received on or about April 4, 2003.  Id. at ¶¶ 11-12.

The instant complaint ("Complaint") was filed with this Court on June 30, 2003.  In addition to her claim that she was denied the supervisory promotion based on national origin discrimination, Plaintiff also asserts retaliation and hostile work environment claims and common law tort claims arising out an incident with defendant Roger Tsao ("Tsao"), described below.  See Complaint Counts IV-XI.

Significantly, Plaintiff's complaint alleges a pattern of discrimination and harassment dating back to as early as 1992.  Specifically, Plaintiff complains that since 1992 she was required to do the microfilming work for the entire Bureau, an allegedly menial task more appropriately performed by secretaries.  See Pl. L. Civ. R. 56.1 Stmt. at 33.  However, Plaintiff was given credit for this work in her PARs.  Further, Plaintiff emphasizes certain allegedly discriminatory PAR reviews.  As discussed above, defendant Royer failed to complete PARs for her between 1995 and 2000.  Plaintiff specifically points to an April 2002 interim PAR completed by Craver, the supervisor assigned to complete her PARs following her union

grievance against Royer, as evidence of discrimination.  In this April 2002 PAR, Craver, who is not named as a defendant in the Complaint, gave Plaintiff the highest overall PAR rating. However, in one sub-category, job knowledge/skills, plaintiff was awarded the second highest score.  This marked a decreased subcategory score from her previous two PARs, i.e. from 3 to 2. Plaintiff alleges that this subscore reduction was false and pretextual and constituted harassment. See Pl. L. Civ. R. 56.1 Stmt. at 36.  Moreover, Plaintiff points to two allegedly discriminatory comments made by Royer.  First, during the Gulf War, Royer allegedly asked Plaintiff "which side are you on?"  Id. at 32.  Second, in January 2002, when Plaintiff inquired why she had not been promoted, Royer allegedly stated: "Your name is enough."  Plaintiff suggests that these alleged comments indicate that she had been denied the promotion based on her Middle Eastern national origin, as evidenced by her last name.  Id.

Plaintiff also alleges that she was subjected to a campaign of retaliatory harassment within the Bureau after she filed her discrimination charge.  First, Plaintiff asserts that she was assigned a substantial increase in permit work.  Plaintiff continues that many of the additional permits were expected to be finished on a priority basis, which forced her to work longer hours and even weekends.  Id. at 35; see also Pl. Opp. Br.  Further, Plaintiff contends that Royer instructed his direct reports, Craver and Tsao, to make grammar corrections and other unimportant edits to the permits in order to harass her.  Id. at 35.  Significantly, in July 2002, Plaintiff alleges that she was verbally and physically accosted by Tsao when she complained about the changes he had made to one of her permits.  Id. at 37.  Tsao allegedly screamed in her face and, using four fingers, vigorously poked her in the shoulder.  Allegedly as a result of this incident, Plaintiff, who was thirty-six (36) years old at the time, suffered a stroke.  Id. at 38.

Plaintiff has never returned to work.  See Complaint at ¶¶ 58-72.

This incident is the basis for Plaintiff's state law tort claims.  See Complaint Counts X-XI.  Subsequent to her stroke, Plaintiff applied for Workers' Compensation benefits and Temporary Disability.  See Complaint at ¶ 69.

II.     **STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.  56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1219, n. 3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989); Hersh v. Allen Prod. Co., 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).

Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or

as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  The rule does not increase or decrease a party's ultimate burden of proof on a claim.  Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." Anderson, 477 U.S. at 255-56.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains.  See Celotex, 477 U.S. at 324.  Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented . . . by depositions, answers to interrogatories, or further affidavits," id., "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, n.12; see also Anderson, 477 U.S. at 247-48 ("[B]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . . the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324; see also Lujan v. National Wildlife Fed., 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit.");

Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363

(3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non- moving party] need not

match, item for item, each piece of evidence proffered by the movant" but rather must exceed the

'mere scintilla' threshold.), cert. denied, 507 U.S. 912 (1993).  Here, the material facts are

undisputed, and thus, the matter is ripe for summary judgment.

III.   **ANALYSIS**

A.     Plaintiff's Retaliation Claims May Not Be Pursued Through Section 1983

Section 1983 cannot be used as a vehicle for circumventing Title VII's filing

requirements.  See Bair v. City of Atlantic City, 100 F. Supp. 2d 262, 265 (D.N.J. 2000); Foster

v. Wyrick, 823 F.2d 218, 221 (8th Cir. 1987) ("Section 1983 establishes no substantive rights; it

is merely a vehicle for seeking a federal remedy for violations of federally protected.").  The

decision to preclude a plaintiff from pursuing Section 1983 claims based on the alleged violation

of Title VII turns on "a finding that the right at issue existed exclusively as a creation of Title

VII."  See Bair, 100 F. Supp. 2d at 265 (citing Foster, 823 F.2d at 220-21).

> The Third Circuit, as well as the vast majority of courts in other
> jurisdictions have held that when a plaintiff alleges conduct which
> violates both rights guaranteed by the Constitution and the statutory
> rights created by Title VII, a plaintiff may bring either a Title VII
> claim, a § 1983 claim, or both.

Hargrave v. County of Atlantic, 262 F. Supp. 2d 393, 440 (D.N.J. 2003) (citing Bradley v.

Pittsburgh Bd. Of Ed., 913 F.2d 1064, 1078-79 (3d Cir. 1990) (concluding that plaintiff's Section

1983 racial discrimination claims were not preempted by Title VII to the extent the complaint

sought to vindicate rights grounded in both Title VII and the Equal Protection Clause of the

Fourteenth Amendment).  For example, courts have allowed plaintiffs alleging both sexual

12

harassment and sex discrimination in public employment based on the same set of facts to file claims under both Title VII and Section 1983, because such conduct not only violates Title VII, but can also amount to a deprivation of the equal protection rights afforded by the Fourteenth Amendment.  See e.g. Hargrave, 262 F. Supp. 2d at 441; Bair, 100 F. Supp. 2d at 267.

Here, Plaintiff asserts unlawful national origin discrimination, hostile work environment and retaliation under both Title VII and Section 1983.  See Complaint, Counts I, III, IV, V, VII, VIII.  Since national origin discrimination can also constitute a violation of the equal protection clause of the Fourteenth Amendment, Plaintiff is not precluded from pursuing these claims under both Title VII and Section 1983.  Further, Plaintiff's Section 1983 hostile work environment claims are also not preempted by Title VII.  In Hargrave, the court allowed the plaintiff to pursue hostile work environment claims under both Title VII and Section 1983.  See Hargrave, 262 F. Supp. 2d at 445, n.21.  Therefore, this Court will also consider Plaintiff's hostile work environment claims under both Title VII and Section 1983.

However, Plaintiff cannot pursue her retaliation claims under Section 1983.  "[C]ourts have held that a claim for retaliation, which was created by Title VII and is not recognized under constitutional principles, may not be pursued through Section 1983."  Bair, 100 F. Supp. 2d at 267, n.3 (citations omitted); see also Great American Federal Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 378 (1979) (holding that Title VII provides the exclusive remedy for a violation of § 704a of Title VII, the statutory section dealing with retaliatory discharge); Hargrave, 262 F. Supp. 2d at 442.  Therefore, Plaintiff's retaliation claims under Section 1983 must be dismissed as a matter of law.

13

B.      Plaintiff's Section 1983 and NJLAD Claims Against The State of New Jersey and the DEP Are Barred By The Eleventh Amendment

It is well established that the Eleventh Amendment provides states, state agencies and state officials with immunity from suits in federal court brought by citizens against them in their official capacities.  See Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989).  It is undisputed that the DEP is an agency of the state of New Jersey.  In her opposition brief, Plaintiff concedes that her Section 1983 and NJLAD claims against the State and the individual defendants in their official capacities are barred by the Eleventh Amendment.  Pl. Opp. Br. at 11-12; see Garcia v. The Richard Stockton College of New Jersey, 210 F. Supp. 2d 545, 550 (D.N.J. 2002) (holding that "a plaintiff may not sue the State of New Jersey, or its alter egos, under the NJLAD in federal court.")  Therefore, Plaintiff's Section 1983 and NJLAD claims against the State of New Jersey and the DEP must be dismissed.[7]

Further, Plaintiff names one hundred (100) unknown defendants or John Does.  However, Plaintiff fails to attribute any conduct to these unknown defendants.  It is "well established that a defendant in a civil rights case cannot be held responsible for a constitutional violation which he or she neither participated in nor approved."  C.H. ex rel. ZH v. Oliva, 226 F.3d 198, 201 (3d Cir. 2000).  Further, there is no respondeat superior liability under Section 1983.  Id. at 202.  Therefore, the State of New Jersey, the DEP, as well as defendants Hamill, Royer and Tsao cannot be held liable for the actions of the unknown, John Doe defendants. Accordingly, all claims related to the conduct of unknown government employees must be dismissed.

---

[7]Plaintiff's NJLAD claims against the individual named defendants are discussed below in Sections III. C. and D.

14

C.      Plaintiff's Claims That She Was Not Promoted Based On National Origin
        Discrimination Must Be Dismissed As Untimely

In order to determine whether Plaintiff's failure to promote claims are timely, this Court

must first determine when these claims accrued.  "[A] discrete retaliatory or discriminatory act

'occurred' on the day that it 'happened.'" National R.R. Passenger Corp. v. Morgan, 536 U.S.

101, 110 (2002). "In employment discrimination suits, the proper focus of the statute of

limitations inquiry 'is on the time of the discriminatory act, not the point at which the

consequences of the act become painful.'" Miller v. Beneficial Mgmt. Corp., 977 F.2d 834, 842

(3d Cir. 1992) (quoting Chardon v. Fernandez, 454 U.S. 6, 8 (1981)).  The Third Circuit has

clarified that "a claim accrues in a federal cause of action upon awareness of actual injury, not

upon awareness that this injury constitutes a legal wrong." Oshiver v. Levin, Fishbein, Sedran &

Berman, 38 F.3d 1380, 1386 (3d Cir. 1994) (citing Keystone Insurance Co. v. Houghton, 863 F.2d

1125, 1127 (3d Cir. 1988)).  The focus of the court's inquiry must be the potential claimant's

awareness; "the claim accrues . . . as soon as a potential claimant either is aware, or should be

aware, of the existence of and source of an injury." Oshiver, 38 F.3d at 1386 (citing Keystone,

863 F.3d at 1127).

In her EEOC complaint, Plaintiff alleged that "on or about January 10, 2001, she applied

for a promotion to the position of Specialist, and on or about February 5, 2001, Respondent's Unit

Manager, [Hunt], told her that her name was removed from the list of those being considered for

the promotion."  EEOC Charge (attached as Exhibit B to Defendants Motion for Summary

Judgment).  Thus, Plaintiff's failure to promote claims would accrue no later than February 5,

2001, the date she became definitively aware that she could not be considered for the promotion

15

because the position was only open to specialists, not engineers.

Further, at this point Plaintiff had already contested the provisional appointment of Friedman.  Both Plaintiff and another applicant of foreign national origin, Oguntala, had contended that this provisional appointment was discriminatory.  As discussed above, Plaintiff also sought to file a Union grievance.[8]  Therefore, it is apparent that Plaintiff believed prior to February 5, 2001 that the DEP's promotion practices were discriminatory.  Even accepting that Plaintiff's claims accrued on February 5, 2001, as the Defendants did in their moving papers, it is clear, absent equitable tolling, that Plaintiff's failure to promote/national origin discrimination claims are untimely.

Plaintiff now contends that her failure to promote claims accrue no earlier than October 9, 2001; that is, the date when the Bureau summarily promoted Bono, Dietze, and Maffei, three non-foreign origin Americans, from Principal Environmental Specialists to Supervising Environmental Specialists without posting the openings or conducting an examination.  See Pl. Opp. Br. at 4; see also Pl. L. Civ. R. 56.1 Stmt. at 20.  Further, Plaintiff argues that her claim did not accrue on February 5, 2001, when she was told that Engineers could not apply for the promotion, because she did not have a cause of action until Friedman was actually promoted to Supervisor.  In her opposition brief, Plaintiff states that "[t]he fact that Ms. Hanani was excluded from the position, alone, did not *create* a cause of action absent a subsequent discriminatory act by DEP, i.e. promoting a less qualified white American."  Pl. Opp. Br. at 6 (emphasis in original).  However, this very type of circular reasoning has been disavowed by the Third Circuit. As explained above,

---

[8]Plaintiff was informed by the Union President, John Seiler, that the provisional appointment was not a grievable matter because she would again have an opportunity to obtain the position when it was posted for permanent status.  See Pl. L. Civ. R. 56.1 Stmt. at 17.

"a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong."  <u>Oshiver</u>, 38 F.3d at 1386.  Therefore, it is irrelevant that the position was subsequently awarded to a less qualified "white American."  What is important is that Plaintiff believed that she was denied the promotion based on her national origin no later than February 5, 2001, when Hunt notified her that her name had been removed from the list.

Further, she asserts that Bono, Dietze and Maffei were only promoted because, under DEP rules, the top three candidates after the competitive examination had to be promoted before they could promote their handpicked candidate, Friedman.  Due to the earlier decision to exclude engineers from the applicant pool, Plaintiff could not take the competitive exam and, therefore, was not eligible for these promotions.  Accordingly, she cannot now argue that these promotions constitute separate acts of discrimination.

Moreover, this Court finds that Plaintiff's claim accrued far earlier than February 5, 2001. The record reveals that Plaintiff was aware, or reasonably should have been aware, that she was not being promoted as early as October 2000, when the posting for the permanent Supervising Environmental Specialist position limited the field of potential applicants to Principal Environmental Specialists.  <u>See</u> Pl. L. Civ. R. 56.1 Stmt. at 19; <u>see also</u> Complaint at ¶ 42. Plaintiff points out that "[a]s a result of the exclusion of persons holding engineer title, all of the foreign national candidates (Ms. Hanani, Jay Patel and Adekunle Oguntala) were now summarily <u>excluded</u> from eligibility for this Supervisory position."  Pl. L. Civ. R. 56.1 Stmt. at 19; <u>see also</u> Complaint at ¶ 42 ("This narrowing of the applicant pool served to exclude all potentially eligible minorities from applying for the position, such as holding Engineer titles who had applied when

the provisional title was posted, e.g. Ms. Hanani.").  As explained above, "the proper focus of the statute of limitations inquiry 'is on the time of the discriminatory act, not the point at which the consequences of the act become painful.'"  Miller v. Beneficial Mgmt. Corp., 977 F.2d at 842.  The allegedly discriminatory act that effectively denied Plaintiff the promotion was the narrowing of the applicant field to exclude Engineers.  At this point, according to the Complaint, not only was Plaintiff aware that she would not be promoted, but she also knew that this allegedly arbitrary decision served to exclude "all potentially eligible minorities" from applying for the promotion.  Accordingly, this Court finds that Plaintiff's claim accrued in October 2000.

       1.    Title VII

Under Title VII, plaintiffs must file a charge with the EEOC within three hundred (300) days of when the alleged unlawful employment practice occurred.  See 42 U.S.C. § 2000e-5 (2005).  Even assuming that her claim accrued on February 5, 2001, Plaintiff was required to file a complaint with the EEOC by December 2, 2002.  Plaintiff did not file an administrative complaint with the EEOC and the NJDCR until February 14, 2002, three hundred and seventy four (374) days later.  Further, as discussed above, the Court finds that Plaintiff's claim accrued in October 2000.  Therefore, Plaintiff clearly failed to file her EEOC complaint within three hundred days of the alleged act of discrimination.  Accordingly, Plaintiff's Title VII national origin discrimination/failure to promote claims are dismissed as untimely.

       2.    Section 1983

Even assuming that her claims accrued on February 5, 2001, Plaintiff still failed to file a timely civil complaint under Section 1983.  In Wilson v. Garcia, 471 U.S. 261 (1985), the Supreme Court held that the applicable statute of limitations in civil rights actions brought

18

pursuant to 42 U.S.C. Section 1983 is to be determined by the State's statute of limitations for personal injury actions, regardless of the topical nature of the civil rights claim pleaded.  Id. at 276-80.  In New Jersey, the statute of limitations for personal injury actions is two (2) years.  See N.J. STAT. ANN. § 2A:14-2 (2005) ("Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued.").  Even accepting that Plaintiff's claims accrued on February 5, 2001, rather than in October 2000, Plaintiff's June 30, 2003 complaint was filed well outside the two year statute of limitations, i.e. nearly two years and five months later.  Accordingly, Plaintiff's Section 1983 national origin discrimination/ failure to promote claims must be dismissed as untimely.

3.    NJLAD

Plaintiff's national origin discrimination/failure to promote claims under NJLAD are also untimely.  Because it is the nature of the injury for which recovery is sought that determines the appropriate limitations period, claims based upon alleged discrimination by their very nature implicate the two year statute of limitations for personal injury claims set forth in N.J. STAT. ANN. § 2A:14-2.  See Montells v. Haynes, 133 N.J. 282, 291–98 (N.J. 1993); see also Ali v. Rutgers, 166 N.J. 280, 282 ( "[C]laims arising under the Law Against Discrimination, N.J. STAT. ANN. §§ 10:5-1 et. seq., are subject to the two-year statute of limitations for personal injuries found at N.J. STAT. ANN. § 2A:14-2 (2005) . . .") (citing Montells, 133 N.J. at 298).  As discussed above, even accepting that Plaintiff's claims accrued on February 5, 2001, rather than in October 2000, she did not file her Complaint until June 30, 2003, well outside the two year limitations period.  Accordingly, Plaintiff's NJLAD national origin discrimination/failure to promote claims must be

dismissed as untimely.

>    4.    Equitable Tolling Is Not Available Under The Circumstances Here Because
>           Plaintiff Was Not Diligent

Equitable tolling is available under Title VII.  In Oshiver, the Third Circuit clarified that

"the time limitations set forth in Title VII are not jurisdictional . . . [they] are analogous to a

statute of limitations and are, therefore, subject to equitable modifications, such as tolling."  See

Oshiver, 38 F.3d at 1387 (citing Hart v. J.T. Baker Chemical Co., 598 F.2d 829, 831 (3d Cir.

1979).  Equitable tolling is generally available in three situations:

> (1) where the defendant has actively misled the plaintiff respecting
> the plaintiff's cause of action; (2) where the plaintiff in some
> extraordinary way has been prevented from asserting his or her
> rights; or (3) where the plaintiff has timely asserted his or her rights
> mistakenly in the wrong forum.

Oshiver, 38 F.3d at 1387 (citations omitted).

Here, Plaintiff argues that, even if the Court were to find that her claims accrued on

February 5, 2001 or earlier, equitable tolling is appropriate because "Ms. Hanani was actively

misled by the Defendants regarding an essential fact in her cause of action with respect to the

promotion of Linda Friedman, i.e. that the decision to exclude her from eligibility was made not

by the New Jersey Department of Personnel, but by Barker Hamill and the other managers in the

Bureau."  Pl. Opp. Br. at 7 (emphasis in original).  Plaintiff asserts that when she inquired in

October 2000 why the permanent posting excluded engineers, Hunt actively misled her by

representing that the decision was made by NJ DOP.  Plaintiff argues that this alleged

misrepresentation critically affected when she chose to file an EEOC discrimination charge

because "only a decision-maker from within the Bureau (or at the most, within the DEP) would

have knowledge that an otherwise facially neutral exclusion of Engineers would *in reality* exclude highly qualified candidates of foreign national origin and none of the white American applicants." Pl. Opp. Br. at 9 (emphasis in original).  In essence, Plaintiff contends that she had no reason to infer that the decision to exclude engineers from the applicant pool was discriminatory until a January 2002 meeting with defendants Hamill and Royer where their "feigned ignorance of the fact that Engineers had been excluded" aroused her suspicions.  Id. at 10.  Allegedly as a result of this "feigned ignorance," Plaintiff initiated inquiries with NJ DOP and the DEP's Human Resource Department and, on February 14, 2002, discovered that the decision to exclude Engineers had been made by the Bureau.  Id. at 11.  Plaintiff then filed her EEOC discrimination charge that same day.  Id.  Thus, Plaintiff concludes that "this is a classic case in which a plaintiff is entitled to equitable tolling of the statute of limitations."  Id.

The Court disagrees.  To invoke equitable tolling, Plaintiff must show that due to the defendants' deception, "she could not, through the exercise of reasonable diligence, discover essential information bearing on her claim."  Oshiver, 38 F.3d at 1390; New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1125-26 (3d Cir. 1997).  Stated differently, the plaintiff must take "reasonable measures to uncover the existence of an injury."  Oshiver, 38 F.3d at 1390 (citing Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1127 (3d Cir. 1988)).  Where, as here, the plaintiff argues that equitable tolling is justified because he or she has been actively misled by the defendants, "the statute of limitations will not begin to run, that is, will be tolled, until the facts which would support the plaintiff's cause of action are apparent, or should be apparent to a person with a reasonably prudent regard for his or her rights."  Oshiver, 38 F.3d at 1389.

In the present case, the Court finds that Plaintiff was not sufficiently diligent to justify the

21

application of equitable tolling.  First, Plaintiff has alleged a pattern of discrimination dating back

to at least 1995, if not from the very beginning of her employment.  See Plaintiff's Deposition

Testimony at 90 (attached as Exhibit C to Defendants' Motion for Summary Judgment).

Essentially, Plaintiff concedes that she was aware of the allegedly discriminatory promotion

practices at the DEP far before defendants Hamill and Royer's "feigned ignorance" allegedly

triggered her suspicions.  In fact, Plaintiff had already attempted to file a union grievance after

Friedman was awarded the temporary position.  The fact that Plaintiff suspected discrimination

throughout her employment severely undercuts her contention that Hunt's alleged

misrepresentation somehow made it impossible to determine whether the decision to exclude

engineers was discriminatory.  See e.g. Williams v. Rohm and Haas Co., 90 Fed. App. 627, 628

(3d Cir. 2004) (affirming district court's decision that equitable tolling could not rescue plaintiff's

untimely failure to promote claims, noting that "plaintiff indicated that he was aware of the racial

discrimination and discussed it with his family as early as 1988); Harper v. Court of Common

Pleas of Philadelphia, 2000 U.S. Dist. LEXIS 7252 at *6, n.5 (E.D. Pa. 2000) (noting that

equitable tolling may not be appropriate in a situation where the plaintiff knew that she had been

denied a promotion and suspected discrimination).  Not only did Plaintiff suspect that she had

been discriminated against throughout her tenure at the DEP, but it was also apparent that the

decision to exclude engineers effectively removed all employees of diverse national origin from

the applicant pool.  Thus, Plaintiff's contention that prior to January 2002 she had no reason to

suspect that the decision to exclude engineers was discriminatory is entirely incredible.

     Moreover, Plaintiff did not take reasonable measures to uncover whether the decision to

exclude engineers was made by the Bureau or by NJ DOP – a fact which she now claims was

critical to determining whether the decision was discriminatory.  In an October 18, 2001 Memo to File, Plaintiff memorialized Hunt's alleged misrepresentation, stating: "She said that the decision was made by the NJ DOP and *to check with them as to why this decision was made*."  Pl. Opp. Br. at 22 (citing Hanani Cert. at ¶ 8) (emphasis added).  Significantly, this memo written by Plaintiff evidences that Hunt actually prompted her to further investigate the situation with NJ DOP in October 2001.  However, Plaintiff failed to make further inquiry into the decision until February 2002.  Plaintiff's lack of reasonable diligence in uncovering facts that she now claims were essential to determining whether the exclusion of engineers from the applicant pool was discriminatory is fatal to her assertion that equitable tolling is appropriate to rescue her otherwise untimely claims.  Therefore, this Court concludes that equitable tolling is not justified because Plaintiff failed to exercise reasonable diligence.

  D.  <u>Plaintiff's Retaliation and Hostile Work Environment Claims Must Be Dismissed</u>

    1. <u>Plaintiff's Title VII Retaliation and Hostile Work Environment Claims Do Not Fall Within The Scope of Her EEOC Charge</u>

  Defendants argue that Plaintiff's retaliation and hostile work environment claims should be dismissed because her EEOC charge only alleged a failure to promote based upon her national origin.  "The parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  <u>Ostapowicz v. Johnson Bronze Co.</u>, 541 F.2d 394, 398-99 (3d Cir. 1976).  "Thus, a subsequent civil action may only encompass forms of discrimination similar or related to those filed in the EEOC charge."  <u>Kresefsky v. Panasonic Communs. & Sys. Co.</u>, 169 F.R.D. 54, 61 (D.N.J. 1996); <u>Jenkins v. Blue Cross Mutual Hosp. Ins. Co.</u>, 538 F.2d 164, 167 (7th Cir. 1976).

Defendants cite a number of cases where the courts have held that certain workplace discrimination claims not included in the EEOC charge were not sufficiently similar or related to those claims included in the charge.  However, Defendants fail to cite a single case addressing whether retaliation and/or hostile work environment claims could reasonably be expected to grow out of a national origin discrimination claim.

In rebutting Defendants' contention, Plaintiff relies on Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).  In Waiters, the Third Circuit recognized that "[w]here discriminatory actions continue after the filing of an EEOC complaint . . . , the purposes of the statutory scheme are not furthered by requiring this victim to file additional EEOC complaints . . ."  Id. at 237.  Thus, the Court stated that "[t]he relevant test in determining whether appellant was required to exhaust her administrative remedies . . . is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.  Id. (citing Hicks v. ABT Associates, 572 F.2d 960, 966 (3d Cir. 1978); Ostapowicz, 541 F.2d at 399).

However, Waiters does not, as Plaintiff suggests, squarely address the issue before this Court; that is, whether retaliation claims can reasonably be expected to grow out of an EEOC charge asserting failure to promote based on national origin.  In fact, the Waiters court emphasized in footnote 10 that it declined to adopt the Fifth Circuit's per se rule "that all claims of 'retaliation' against a discrimination victim based on the filing of an EEOC complaint are 'ancillary' to the original complaint, and that therefore no further EEOC complaint need be filed."  Waiters, 729 F.2d at 237, n.10.  Instead, Waiters reenforced the Third Circuit's recognition that, consistent with Title VII's remedial scheme, "suits based on new acts that occur during the pendency of the case *which are fairly within the scope of an EEOC charge or the investigation growing out of the*

24

*complaint*" should be permitted.  Id. at 237 (citations omitted) (emphasis added).  Thus, the Court's focus must be whether Plaintiff's retaliation claims are fairly within the scope of her EEOC charge or the investigation that followed.

The Waiters court's decision to allow plaintiff's retaliation claims to go forward relied on much different facts and cannot be taken to support Plaintiff's position.  In Waiters, the plaintiff's formal complaint actually charged retaliation, just based on a different factual underpinning.  Id. at 237.  The court emphasized that "the investigation clearly went beyond the specific problem alleged in the formal complaint, and found evidence of retaliatory intent in a pattern of actions . . ."  Id. at 238.  Further, the court pointed out that, despite the different circumstances and officials involved in the retaliation allegations asserted in the EEOC charge and the complaint, the core grievance – retaliation – was the same.  Id.  In Waiters, not only did the investigation actually "f[ind] evidence of retaliatory intent in a pattern of actions," but the EEOC also recommended remedies focused on avoiding future discriminatory conduct.  Id.

Here, Plaintiff's EEOC charge clearly did not assert any retaliation claims.  On its face, the charge only alleged that Plaintiff was denied a promotion opportunity based on her Egyptian national origin.  Moreover, Plaintiff has produced no evidence that the NJDCR's investigation (which was forwarded to the EEOC) went beyond her specific allegations.  Unlike Waiters, Plaintiff's core grievance was not retaliation and there is no evidence that the investigation focused on avoiding future discriminatory conduct.  Therefore, even drawing all reasonable favorable inferences in her favor, this Court strains to find that Plaintiff's retaliation claims fairly flow from her EEOC charge, or the investigation arising therefrom.

Specifically, Plaintiff contends that the defendants retaliated against her by "assigning her

25

to substantially more work permits than previously, and then continuously harass[ing] her with respect to these permits on manifestly pretextual grounds . . ." Pl. Opp. Br. at 33.  Although the Court agrees that this conduct may in certain circumstances constitute adverse employment action sufficient to support a retaliation claim, Plaintiff's EEOC charge did not even suggest that the discriminatory conduct being complained of encompassed the assignment of these allegedly demeaning and out-of-title duties.  Therefore, it is unreasonable to assume that the EEOC would have investigated any conduct relating to Plaintiff's retaliation claims.  Broadly construing Plaintiff's EEOC charge, the allegations would have reasonably prompted an investigation limited to the DEP's promotion scheme.  Accordingly, this Court finds that the retaliatory acts alleged in Plaintiff's complaint are not fairly within the scope of her EEOC charge or the investigation stemming therefrom.

Plaintiff does not dispute Defendant's contention that her hostile work environment claims do not fall within the scope of her EEOC charge.  In her opposition brief, Plaintiff only argues that this Court should consider her retaliation claim to be within the scope of her EEOC charge. Further, for the reasons discussed above, this Court finds that Plaintiff's hostile work environment claims are not fairly within the scope of her EEOC charge or the investigation stemming therefrom. Therefore, Plaintiff's retaliation and hostile work environment claims must be dismissed.

Moreover, as discussed below, this Court finds that Plaintiff cannot establish that Defendants' alleged harassment was sufficiently pervasive in order for her hostile work environment claims to survive summary judgment.

2.      Plaintiff's Hostile Work Environment Claims

Even if this Court were to find that Plaintiff's hostile work environment claims fairly flow

from her EEOC charge or the investigation stemming therefrom, Plaintiff's hostile work

environment claims under Section 1983, Title VII and NJLAD must be dismissed because she

cannot establish a prima facie case of hostile work environment.  "To state a claim for hostile work

environment [based on national origin], . . . plaintiff must allege conduct that occurred because of

her [national origin] and that a reasonable [person] would consider sufficiently severe or pervasive

to alter the conditions of employment and create an intimidating, hostile, or offensive working

environment."  Lehman v. Toys 'R' Us, Inc., 132 N.J. 587, 603 (1993) (discussing hostile work

environment sexual harassment).  In assessing hostile work environment claims, the Court must

examine the totality of the circumstances.  These circumstances include "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work performance."

Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).

Defendants accurately summarize the circumstances that Plaintiff alleges in support of her

hostile work environment claims.  These circumstances are:

> (1) a highest possible performance ("PAR") rating, but an internal
> average score on one sub-category; (2) being placed in charge of the
> section's microfilming work, [a task which plaintiff received credit for
> on her PARs]; (3) an alleged comment during the 1991 Gulf War where
> plaintiff was asked "which side are you on?"; (4) being required to
> work on a "water supply program" that was to end in the future; (5) not
> receiving PARs from 1995 to 2000; (6) doing work on permits, in
> addition to the microfilming and water supply program work; and, (7)
> the argument she had with Roger Tsao concerning edits to a permit
> [she] was working on.

Defendants' Motion for Summary Judgment at 31.

Even when drawing all reasonable favorable inferences in Plaintiff's favor, this Court finds

that the totality of the circumstances as alleged are not sufficiently severe or pervasive to support a hostile work environment claim.  The alleged conduct must be "severe or pervasive enough to create an *objectively* hostile or abusive work environment."  Harris, 510 U.S. at 21-22 (emphasis added).  As the New Jersey Supreme Court has explained, courts have adopted an objective standard because:

> [a] hypersensitive employee might have an idiosyncratic response to conduct that is not, objectively viewed, harassing.  Allegations of such non-harassing conduct do not state a claim, even if the idiosyncratic plaintiff perceives her workplace to be hostile, because the complained-of conduct, objectively viewed, is not harassment, and the workplace, objectively viewed, is not hostile.

Lehmann, 132 N.J. at 613.  Plaintiff relies on isolated instances of alleged harassment, including two allegedly harassing comments and the incident with Roger Tsao.  These few remote instances of alleged harassment are not sufficiently severe or pervasive to create an objectively hostile or abusive work environment.  Further, the other allegedly harassing conduct, including the decreased PAR sub-score and the assignment of permit work that Plaintiff considered demeaning and inappropriate for an engineer, are not sufficiently severe to support her claim.  As discussed above, Plaintiff still received the highest overall rating on that particular PAR, despite the one level decrease in a sub-score.  With respect to the permit work, Plaintiff was commended in her PARs for her diligence in completing this work and, after her departure, another engineer was assigned to do the very same permit work.  Moreover, there is absolutely no evidence that any of the alleged harassment affected Plaintiff's ability to do her job.  In fact, Plaintiff alleges quite the opposite – that she was the most qualified employee for the supervisory promotion based on her exemplary job performance, as evidenced by her consistently high PAR scores.  Accordingly, this Court finds

that the totality of the circumstances do not support Plaintiff's hostile work environment claims.[9]

3.      Plaintiff's NJLAD Retaliation Claims

Plaintiff concedes that her "NJLAD . . . claims against the State and the individual defendants in their official capacities are barred by 11ᵗʰ Amendment Immunity."  Pl. Opp. Br. at 11 (citations omitted).  Plaintiff's NJLAD claims against the individual defendants in their individual capacities also must be dismissed.  Under NJLAD, it is unlawful "for any person, whether an employer or employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."  N.J. STAT. ANN. § 10:5-12(e).  "[I]t is fundamental to aiding and abetting liability that the aider and abettor acted in relation to a principal."  Failla v. City of Passaic, 146 F.3d 149, 158 (3d Cir. 1998).  Thus, an individual employee can not be found liable for discrimination under NJLAD unless the employer is first found liable.  See id. ("Once the city has been found liable, the issue becomes whether under § 12(e), any employee is liable for aiding and abetting.").  Here, the principal, DEP, cannot be found liable because, as explained above, they are immune from suit under the Eleventh Amendment.  Thus, it would be impossible to establish that the alleged aiders and abetters, defendants Hamill, Royer and Tsao, are liable because a predicate finding that the DEP is liable as a principal cannot be made.  Therefore, Plaintiff's NJLAD retaliation claims are dismissed.[10]

_____

[9]The Court notes that Plaintiff does not argue in her opposition brief that she can demonstrate a hostile work environment and, as discussed above, concedes that her hostile work environment claims do not fall within the scope of her EEOC charge.

[10]As discussed above, Plaintiff's NJLAD national origin discrimination claims are dismissed as time barred.  See Section III.B.3.

29

E.       Plaintiff's Tort Claims Must Be Dismissed Because Her Sole Remedy Lies Under
         New Jersey's Workers' Compensation Statute

Plaintiff seeks damages for her injuries that allegedly arise out of her argument with

defendant Tsao.  As explained above, Plaintiff contends that she suffered a stroke after Tsao

allegedly screamed at her and poked her hard in the shoulder with his fingers.  See Complaint at ¶¶

60-68.  However, under the Workers' Compensation statute, employees surrender "their rights to

any other method, form or amount of compensation or determination thereof than as provided in

this article . . ."  N.J. STAT. ANN. § 34:15-8 (2005).  As the New Jersey Supreme Court has

explained:

> By accepting the benefits of the Act, the employer assumes an
> absolute liability.  He gains immunity from common lawsuit, even
> though he may be negligent, and is left with a limited and determined
> liability in all cases of work related injury.  On the other hand, the
> employee foregoes his right to sue his employer for negligence.

Dudley v. Victor Lynn Lines, 32 N.J. 479, 489 (1961).  Thus, the benefits provided under the

Workers' Compensation statute constitute the exclusive remedy of an employee against his

employer for injuries arising out of and in the course of his employment.  Here, after suffering the

stroke, Plaintiff applied for Workers' Compensation benefits.  See Complaint at ¶ 69.  Therefore,

Plaintiff's exclusive remedy for her stroke lies in workers' compensation.

There is a very narrow exception to the exclusivity of the Workers' Compensation statute

for injuries resulting from an "intentional wrong."  See Millison v. E.I. DuPont de Nemours & Co.,

101 N.J. 161, 170-171 (N.J. 1985).  In Millison, the New Jersey Supreme Court stated that

"intentional wrong . . . means 'deliberate intention' and is not equatable with gross negligence or

similar concepts importing constructive intent."  Id. at 170.  "[T]he mere knowledge and

30

appreciation of a risk – even the strong probability of a risk – will come up short of the 'substantial certainty' needed to find an intentional wrong resulting in avoidance of the exclusive-remedy bar of the compensation statute."  Id. at 179.  Plaintiff does not argue that the alleged finger poking incident rises to the level of an "intentional wrong," so as to fit within this very narrow exception to the exclusivity of the Workers' Compensation statute.  Further, the Court finds that even if the DEP was aware of any of the alleged discriminatory conduct, the record does not reveal that it deliberately ignored any attendant risks.  For example, in Millison, the Court found that the employer's knowing exposure of its employees to asbestos fell short of the substantial certainty needed to find an intentional wrong even though the employer's conduct "clearly amount[ed] to deliberately taking risks with employees health . . ."  Millison, 101 N.J. at 179.  The DEP's alleged conduct clearly does not even rise to the level found to be insufficient in Millison.  Moreover, it seems clear that Plaintiff's stroke cannot be considered an inevitable consequence of the alleged discriminatory conduct.  Therefore, Plaintiff's common law tort claims must be dismissed.

IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted and Plaintiff's complaint is dismissed.  An appropriate form of order is filed herewith.


   s/ Garrett E. Brown, Jr.

GARRETT E. BROWN, JR., U.S.D.J.
